UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SAMUEL JEAN-BAPTISTE,                    *
                                         *
            Petitioner,                  *
                                         *
     v.                                  *        Civil Action No. 14-cv-11698-IT
                                         *
MICHAEL THOMPSON,                        *
                                         *
            Respondent.                  *

ORDER

March 15, 2017

TALWANI, D.J.

     After review of the Magistrate Judge's February 10, 2017, Report and Recommendation [#41] [attached hereto], to which there has been no objection, the court hereby ACCEPTS and ADOPTS the recommendation for the reasons set forth therein. The Petition for Writ of Habeas Corpus [#1] is accordingly DENIED.

     IT IS SO ORDERED.

/s/ Indira Talwani
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SAMUEL JEAN-BAPTISTE,

      Petitioner,

v.

MICHAEL THOMPSON,

      Respondent.

No. 14-CV-11698-IT

## REPORT AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254 PETITION (#1)

February 10, 2017

CABELL, U.S.M.J.

## I.   INTRODUCTION

Petitioner Samuel Jean-Baptiste ("the petitioner") is currently incarcerated at the Massachusetts Correctional Institution in Concord following his conviction in the Middlesex County Superior Court for home invasion, assault in a dwelling, assault with a dangerous weapon, assault and battery, unlawful possession of a loaded firearm, masked armed robbery and unlawful possession of ammunition[1].  Pending before the Court is the petitioner's petition for writ of habeas corpus under 28 U.S.C. § 2254.  (Dkt. No. 1).  After careful consideration of

---

[1] As discussed below, the unlawful possession of ammunition conviction was later vacated.

the record in this case, and for the reasons set forth below, it
is respectfully recommended that the habeas petition be denied.

**II.   FACTS**

**A. <u>The Underlying Crime</u>**

Because the Appeals Court's decision did not include
findings of fact, the facts as the jury might have found them
are taken from the trial transcript.  In habeas proceedings
filed by a prisoner in state custody, "a determination of
factual issues by the State court should be presumed to be
correct."  28 U.S.C. § 2254(e)(1).  The petitioner has "the
burden of rebutting the presumption of correctness by clear and
convincing evidence."  *Id*.  The petitioner does not appear to
challenges the state court's factual findings and in any event
has not presented clear and convincing evidence to rebut the
presumption that the factual findings are correct.

The petitioner and Steven Noel met in high school.  (Trial
Transcript, Dkt. No. 17 Exs. A-G, [hereinafter Tr. __ __], Vol.
III, page 15).  After Noel lost his job, the petitioner asked
Noel to help him steal money from a house in Malden.  (Tr. III
17-19).  Kareem Jean-Louis, who worked at a U-Haul rental center
on Route 16 near the Somerville/Medford line, and who knew the
petitioner, recalled that on September 28, 2007, the petitioner
came to her workplace and left with a U-Haul van.  (Tr. III 78-
83, 85).  On September 30, 2007, shortly before midnight

2

(October 1, 2001), Steven Noel and the petitioner travelled to 15-17 Ellis Street, Malden, the location that they intended to burglarize.  (Tr. III 26-28).

15-17 Ellis Street is a two-family home.  The petitioner had lived in the first floor unit for five or six months in early 2007.  (Tr. II 39-40, 43).  On the night of the home invasion for which the petitioner was convicted, the second floor, known as 15 Ellis Street, was occupied by the owner, Jean Gaston Thermitus, his wife, and his adult son.  (Tr. II 39, 48-49).  Three tenants lived on the first floor, known as 17 Ellis Street.  (Tr. II 39, 44, 80).  Jean Marie Lamour lived in the bedroom closest to the front door.   (Tr. II 56, 61, 79, 88-89; III 32-33, 37).  Bernard Aurelien occupied the bedroom in the rear of the house, off the kitchen.  (Tr. II 57, 79-80, 88-89; III 30, 32-33).  Ramon Saintvil lived in the third bedroom. (Tr. II 80, 88).

Noel and the petitioner parked their U-Haul van directly in front of 15-17 Ellis Street, and Noel followed the petitioner down the driveway to the back porch.  (Tr. II 51; III 28).  Noel was carrying a flashlight and a roll of duct tape.  Noel testified that the petitioner was carrying a pistol.  (Tr. II 72-75, 89, 92; III 31, 33-35; Exhibits 5-8).  The petitioner was able to open the outer door, which led to an alcove from which separate doors led to the cellar, the first floor unit, and the

second floor unit.  (Tr. III 28-30, 94-96, 101-103; Exhibits 14A-14E).  The petitioner and Noel then donned black ski masks. (Tr. II 92-94; III 27-29; IV 15-17; Exhibits 5-8).

The petitioner was able to open the porch door into the alcove with a key.  (Tr. III 28-29).  After checking the cellar, they entered the dark first floor apartment and the petitioner led them to a bedroom.  (Tr. III 29-30).  Bernard Aurelien was asleep in his bedroom when he was awakened by noise at his bedroom door.  (Tr. II 89, 91; III 30-31).  Two black men wearing black sweaters and masks rushed into his bedroom.  (Tr. II 106-109).  Though the room was dark, Aurelien could see that one of the men carried a pistol and a flashlight.  (Tr. II 92-94, 110-111).  He could not see whether the two men were wearing gloves.  (Tr. II 107-108).  The man holding the flashlight and pistol[2] said to him, "Stay easy . . . if you don't talk, everything gonna be easy."  (Tr. II 89).  The other man pocketed Aurelien's cell phone, which was in a charger next to his bed. (Tr. II 90, 95).  When Aurelien asked "why," the man with the pistol pointed the gun at him and warned "if you move, I gonna fuckin' blow you out."  (Tr. II 89, 112-113).

The two men tightly bound Aurelien's hands and legs with duct tape and covered his mouth and eyes.  (Tr. II 80, 93-94).

---

[2] Noel testified that he was carrying the roll of duct tape and the flashlight, (Tr. III 31), and that the petitioner was carrying the pistol. (Tr. III 31, 33-35).

He lay down on his bed and his head was covered by his sheet.
(Tr. II 89, 94).  He listened to the two men speaking in Haitian
Creole, which he understood, and heard one say, "Turn on the
light." (Tr. II 109).  Noel testified that he and the
petitioner found the light switch, searched the room, and then
turned off the light when they left the room.  (Tr. III 32-33).
Aurelien heard the men search his pants, which he had left on
the chair by his bed.  (Tr. II 90, 92, 95).  His wallet,
containing 200 dollars, was in the pocket of those pants.  (Tr.
II 95).  He heard the men leave his bedroom and enter Lamour's
bedroom next door.  He heard Lamour shout and heard what he
described as Lamour being "put" on the floor.  (Tr. II 95-96).
Aurelien tried to free his hands and remove the duct tape
wrapped over his mouth.  (Tr. II 94-95).

Noel testified that after he and the petitioner left
Aurelien's bedroom they went into another bedroom.  (Tr. III
33).  The petitioner knocked on the door, which was locked, and
a man inside (Lamour) opened the door.  (Tr. III 33).  The
petitioner pulled out a pistol and rushed into the room.  (Tr.
III 33-34).  They told Lamour they "wasn't trying to hurt him
[and were] just here to get some money."  (Tr. III 34).  When
Lamour tried to take the pistol from the petitioner, the
petitioner and Noel grabbed Lamour and pulled him to the floor.
(Tr. III 34-35).  Noel said he tied the man's legs and hands

with the tape, and "surround[ed] his mouth with the tape." (Tr. III 35).  The petitioner took the cell phone from the computer desk by the bedroom door, shut it off, and put it in his pocket. (Tr. III 35).

They searched the bedroom until Noel heard what he thought was someone on a motorcycle in the driveway.  (Tr. III 36-37). Noel told the petitioner "we gotta go" and found the front door. (Tr. III 36-37).  He removed his mask before exiting the apartment and passing "the guy that was on the motorcycle" who was walking to the door.  (Tr. III 37).  The landlord's son, Jean Thermitus, remembered seeing a white U-Haul van in front of 15-17 Ellis Street when he returned home from work just before midnight, and passing a man dressed in black on the front walk. (Tr. II 49-52).

Noel said he drove the U-Haul van around the corner and waited until the petitioner joined him.  (Tr. III 37).  As Noel drove off, the petitioner began to count out cash and handed Noel nearly 200 dollars.  (Tr. III 37-40).  According to Noel, the petitioner then admitted, "I used to live there," and "I think one of the guys would be able to identify me."  (Tr. III 38-39).

Malden Police Officers Alison Lutkevich and Jesus Montoya responded to a 12:25 a.m. dispatch to investigate an incomplete 9-1-1 call made from 17 Ellis Street.  (Tr. II 54-55, 75-76,

79).  They arrived to find the front door to 17 Ellis Street standing half open.  (Tr. II 56).  The front door had a deadbolt separate from the lock in the door knob; no key was needed to unlock the door from the inside.  (Exhibits 15A, 15E).  There was no sign of forced entry at either the front or back door. (Tr. II 76, 78; III 94-96, 101-103; IV 17-20; Exhibits 14A-14E and 15A-15E).  The landlord, Jean Gaston Thermitus, testified that he did not change the locks on the back door after the petitioner moved out.  (Tr. II 42, 47).

Aurelien heard the officers knock and announce themselves and he called out for help.  (Tr. II 57, 79-80, 96).  Officer Lutkevich found Aurelien in his bedroom and helped him remove the duct tape with which he had been bound.  (Tr. II 57, 79-80). Officer Montoya and Officer Lutkevich found Lamour in the bedroom closest to the front door of the first floor apartment. (Tr. II 53-56).  Lamour was bound with duct tape at the arms, knees, ankles, and around his head, covering his mouth.  (Tr. II 56, 57-58, 65-66; Exhibits 2A-2D).  Officer Montoya used his knife to cut Lamour free.  (Tr. II 57-58, 63-64; Exhibit 3).  He saw that Lamour had some bleeding from his gums.  (Tr. II 65). He also noticed a roll of duct tape on Lamour's bed and a flashlight on the floor.  Detective Scott Mann later collected those items, which had not been moved from their original locations.  (Tr. II 66, 72-75, 87; IV 15-16, 24; Exhibits 5-6,

7-8).  Detective Mann also collected numerous pieces of duct tape removed from Lamour and Aurelien.  (Tr. II 57-58, 63-64, 81, 87; IV 22-23, 32; Exhibits 16A-16I).

A day and a half after the home invasion, the Somerville Police stopped a pick-up truck in which Noel and the petitioner were passengers.  (Tr. V 8-10, 16-17).  Somerville Detective John Oliveira was the first to approach the petitioner, who was a passenger in the front seat.  Detective Oliveira saw the petitioner moving his right hand and looking back over his left shoulder.  (Tr. V 9-10, 17-18).  The detective ordered the petitioner to show his hands but the petitioner did not comply. (Tr. V 11).  As the detective was about to open the passenger door, he "heard a loud metal object hit the right floor panel." (Tr. V 11, 18, 19).  The detective opened the door and saw a black pistol near the seat between the petitioner's knee and the door frame.  (Tr. V 11-12, 18).  He seized the pistol, later determined to be a loaded 9mm High Point pistol, and arrested the petitioner.  (Tr. V 12-15, 24-27; Exhibits 26A, 26B, 27, 28).  Noel later identified this as the same pistol that the petitioner carried "two nights before," (Tr. III 49), and Bernard Aurelien testified that it looked like the one pointed at him during the home invasion.  (Tr. II 96-98, 100-102, 105-106, 108, 112-113).

8

Medford police officer Frank Femino assisted with the stop. (Tr. V 15, 16, 29-30).  He removed Noel from the "makeshift" bench seat behind the driver and the petitioner and found beneath Noel's place on the "seat" a black pistol, which was later determined to be a "blank pistol" rather than a real gun. (Tr. III 47; V 15, 31; Tr. V 27- 28; Exhibit 12A, 12B).  Noel testified that the blank pistol was his.  (Tr. III 46-48).

After speaking to Noel, Malden Detective Sergeant Theodore Meroski located a white U-Haul van parked in front of Noel's home in Everett.  (Tr. III 50-51, 60, 88, 89, 98-99).  State Police Trooper Patrick Moynihan concluded a fingerprint found on the side of this van was made by Noel.  (Tr. IV 120).  The State Police Crime Lab examined the roll of duct tape and the flashlight left in Lamour's bedroom, the pistol found with the petitioner, the blank pistol found with Noel, and the pieces of duct tape removed from Lamour and Aurelien at the scene.  (Tr. II 57-58, 63-65, 66, 76, 80-8.1, 87; IV 15-17, 22-23, 29, 30-32, 34-35, 45).  The Crime Lab also received DNA samples from Lamour, Aurelien, Noel and the petitioner.  (Tr. IV 21-22, 24, 28, 57-59). Chemist Jamie Sperdudo separated the duct tape cut from Lamour and Aurelien into 40 pieces, and preserved traces of human blood she found on three pieces.  (Tr. IV 11, 29-30, 31, 36, 38, 45-46, 48).  A second chemist, Kristen Zaramba, concluded that the blood matched the DNA profile of Lamour, whom

9

Officer Montoya had noticed was bleeding from the gums.  (Tr. II
65; IV 58, 60).

Trooper Patrick Moynihan examined the 40 pieces of duct
tape.  (Tr. IV 30-32, 36-37, 38, 110-111).  He located, dyed,
and photographed three "impressions" or "latent prints" that
appeared "to be of sufficient quality and quantity" to examine.
(Tr. IV 93, 98, 100, 102-107, 112, 121, 133).  Of these three,
he concluded one "was lacking quality and quantity," a second
was not made by the petitioner, and the third, "to a reasonable
degree of scientific certainty," was made by the right index
finger of the petitioner.  (Tr. IV 29-30, 60, 91, 113-114, 115,
119, 134; Ex. 25; R. 50).

**B. State Court Proceedings**

Following a jury trial, the petitioner was found guilty of
home invasion, armed robbery while masked, armed assault upon an
occupant in a dwelling, assault by means of a dangerous weapon,
assault and battery, possession of a firearm without a firearms
identification card, possession of a loaded firearm, and
possession of ammunition.  He was sentenced and is currently
incarcerated at MCI-Concord.  The petitioner filed a timely
notice of appeal.

In an unpublished decision issued May 17, 2011, the
Massachusetts Appeals Court vacated the petitioner's conviction
on count fourteen (possession of ammunition) on the ground that

it was a lesser included offense of his conviction for possession of a loaded firearm and thus constituted double jeopardy. The Appeals Court affirmed the petitioner's conviction on all other counts. *Commonwealth v. Jean-Baptiste*, 79 Mass. App. Ct. 1118 (2011) ("*Jean-Baptiste I*"). The petitioner filed an application for further appellate review with the Massachusetts Supreme Judicial Court (SJC). The SJC denied the application on July 1, 2011.

On February 3, 2012, the petitioner filed a motion for a new trial in the Superior Court. The Superior Court denied the motion and the petitioner appealed. On September 3, 2013, the Appeals Court affirmed the order denying the motion for a new trial. *Commonwealth v. Jean-Baptiste*, 84 Mass. App. Ct. 1109 (2013) (*Jean-Baptiste II*). On February 4, 2014, the petitioner filed another application for further appellate review. The SJC denied the application on February 28, 2014.

## C. **Relevant Procedural Background**

The petitioner initiated this federal matter by filing a habeas petition on April 7, 2014. (Dkt. No. 1). The petition asserts six grounds for relief. (Id.). The respondent answered the petition on June 12, 2014. (Dkt. No. 13). By order of the Court, both parties have submitted legal memoranda addressing the merits of the petitioner's claims. (Dkt. Nos. 30 and 38). Notably, the petitioner's brief only addresses four of the

grounds raised in his petition, grounds 1, 4, 5 and 6, and the petitioner therefore has arguably waived grounds 2 and 3.  In the interests of thoroughness, however, the Court addresses all six claims on the merits.  The petition asserts the following claims:

- **Claim 1:** The petitioner's due process rights were violated because the trial judge did not instruct the jury that, in order to convict the petitioner of crimes charged, the Commonwealth needed to prove beyond a reasonable doubt that the petitioner knew his co-defendant was armed prior to the crime.

- **Claim 2:** The admission of fingerprint evidence and fingerprint expert testimony deprived the petitioner of his due process right to a fair trial, because the ACE-V fingerprint analysis process the police employed is inherently unreliable.

- **Claim 3:** The joinder of the petitioner's trial on the home invasion charges with the firearms charges arising from the traffic stop (counts 12-14) deprived the petitioner of his due process right to a fair trial.

- **Claim 4:** The trial judge's failure to instruct the jury that armed robbery requires the use of a working firearm impermissibly lowered the government's burden of proof on this element.

- **Claim 5:** The offense of assault and battery is a lesser included offense within the crime of assault and battery by means of a dangerous weapon and the petitioner's conviction on both offenses therefore violated the double jeopardy clause.

- **Claim 6:** All of the preceding claims taken together cumulatively deprived the petitioner of a fair trial in violation of the Fourteenth Amendment.

(Dkt. No. 1).

## III. DISCUSSION

### A. Standard of Review

"Federal habeas is not an ordinary error-correcting writ." *Nadworny v. Fair*, 872 F.2d 1093, 1096 (1st Cir. 1989).  It "exists to rescue those in custody from the failure to apply federal rights, correctly or at all."  *Id*.  Habeas relief is only available if a prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (internal quotations and citations omitted).  A writ of habeas corpus thus "does not lie for errors of state law."  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

A federal court may grant a writ of habeas corpus only if the underlying state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (as amended by the Antiterrorism and
Effective Death Penalty Act of 1996 (AEDPA)).  Here, the
petitioner does not argue that the trial court unreasonably
determined the facts.  This Court's task, therefore, is to
"determine what arguments or theories supported the state
court's decision," and then determine whether "those arguments
or theories are inconsistent with the *holding* in a prior
decision of [the Supreme] Court."  *Wetzel v. Lambert*, 565 U.S.
520, 524 (2012) (emphasis added) (quoting *Harrington v. Richter*,
562 U.S. 86 (2011)).  *See also Howes v. Fields*, 565 U.S. 499,
505 (2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)
("In this context, 'clearly established law' signifies 'the
holdings, as opposed to the dicta'" of Supreme Court
decisions.)).

     In habeas cases, "a state court is afforded deference and
latitude."  *Hensley v. Roden*, 755 F.3d 724, 731 (1st Cir. 2014)
(citation omitted).  A state court decision is "contrary" to
clearly established federal law only where "the state court
applies a rule different from the governing law set forth in
[Supreme Court] cases, or if it decides a case differently than
[the Supreme Court has] done on a set of materially
indistinguishable facts."  *Bell v. Cone*, 535 U.S. 685, 694
(2002).  A decision is an "unreasonable application" of federal
law where "the state court correctly identifies the governing

legal principle from [the Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* The magnitude of the error "'must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court.'" *Brown v. Ruane*, 630 F.3d 62, 67 (1st Cir. 2011) (quoting *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002)).

Even assuming that this Court were to find that the state court committed an error, habeas relief is only appropriate if the error had "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). In other words, habeas relief cannot be granted for "harmless" errors, which are defined as those errors that did not impact the verdict.

Applying these principles to this case, the Court discerns no errors in the state court's consideration and adjudication of the petitioner's claims.

B. **Claim One: Joint Venture Instruction re:  Knowledge Noel was Armed**

The petitioner argues that the trial judge erred because he did not instruct the jury that the Commonwealth was required to prove beyond a reasonable doubt that the petitioner knew his co-defendant was armed prior to the home invasion. At trial, the judge instead instructed the jury that "they must find that the

defendant was present with knowledge that the alleged co-venturer intended to commit the specific crime of home invasion while armed with a dangerous weapon, and robbery while masked and armed with a dangerous weapon, 'to wit: a firearm.'" *Jean-Baptiste I*, 79 Mass. App. Ct. 1118, at *1.  The Appeals Court considered this claim and reasoned that while the jury instruction could have been more artfully stated, "the words used by the judge conveyed the substance of that idea [that in order to be convicted the petitioner must have known that a participant in the crime was armed]." *Id*.

The petitioner's challenge to the jury instruction is not cognizable here because, as the Appeals Court noted, the petitioner "did not object to the instruction prior to the time the jury retired to commence their deliberation, nor did he object to the judge's answer to the jury's first question [on the subject]." *Jean-Baptiste I*, 79 Mass. App. Ct. 1118, at *1 n.1.  Under Massachusetts law, a failure to formally object to a jury instruction when given results in the waiver of that objection.  *Burks v. Dubois*, 55 F.3d 712, 716 n.2 (1st Cir. 1995).  The First Circuit "[has] held, with a regularity bordering on the monotonous, that the Massachusetts requirement for contemporaneous objections is an independent and adequate state procedural ground, firmly established in the state's jurisprudence and regularly followed in its courts." *Janosky v.*

*St. Amand*, 594 F.3d 39, 44 (1st Cir. 2010).  A state court decision based on adequate and independent state law grounds is not reviewable via habeas petition.  *Burks*, 55 F.3d at 716.

Even assuming the claim has not been waived, habeas relief generally is not available to address jury instructions that incorrectly explain state law.  *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) (citing *Estelle*, 502 U.S. 62  and stating"[o]utside of the capital context, [the Supreme Court has] . . . held that instructions that contain errors of state law may not form the basis for federal habeas relief"); *Silva v. Roden*, 52 F. Supp. 3d 209, 234 (D. Mass. 2014) (argument that jury instructions did not accurately explain the elements of a state law crime does not state a federal habeas claim, but inconsistent jury instructions that create confusion and instructions that relieve government of burden of proving all elements of a crime are reviewable).  Faulty jury instructions may, however, provide a basis for obtaining habeas relief where "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).  To make this determination, the Court must consider the challenged instruction "in the context of the instructions as a whole and the trial record."  *Id*.  The instruction at issue here did not so infect the trial as to amount to a due process violation.  On

the contrary, the Court agrees with the Appeals Court's analysis and conclusion that the jury would have understood from the trial judge's instruction that it must find that the petitioner knew a pistol would be used in the crime.

## C. **Claim Two: Fingerprint Evidence and Related Testimony**

At trial, Trooper Moynihan testified as to his opinion that a latent fingerprint lifted from a piece of duct tape at the crime scene matched the petitioner's right index finger "to a reasonable degree of scientific certainty." (Tr. IV 29-30, 60, 91, 113-114, 115, 119, 134). The petitioner contends that the admission of the fingerprint evidence and Trooper Moynihan's testimony violated the petitioner's due process right to a fair trial because the "ACE-V" (Analysis, Comparison, Evaluation and Verification) method used to analyze the fingerprints is inherently unreliable.

As noted above, the Court deems this claim to be waived where the petitioneer did not address it in his memorandum of law in support of his habeas petition. (Dkt. No. 30). *See Perkins v. Russo*, No. 02-10460-MLW, 2007 WL 2507741, *3 (D. Mass. Aug. 31, 2007). It fails on the merits in any event. Under federal law, an incorrect evidentiary ruling that results in a fundamentally unfair trial may violate due process and, thus, may provide grounds for federal habeas relief. *See Montana v. Egelhoff*, 518 U.S. 37, 43 (1996); *Petrillo v.*

18

*O'Neill*, 428 F.3d 41, 44 n.2 (1st Cir. 2005).  But, to trigger such relief, the state court's application of state law must be "so arbitrary or capricious as to constitute an independent due process . . . violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *see also Abdul-Salaam v. Beard,* 16 F. Supp. 3d 420, 467 (M.D. Pa. 2014) (To succeed on claim that trial was unfair due to lack of testimony regarding the scientific unreliability of fingerprint evidence, petitioner "must show that the admission of the fingerprint evidence 'undermined the fundamental fairness of the entire trial' because the probative value of the fingerprint evidence, though relevant is greatly outweighed by the prejudice to the accused from its admission.").

Here, the state court's decision to admit Trooper Moynihan's opinion testimony was not incorrect under state law. As the Appeals Court noted, Trooper Moynihan's ACE-V testimony was presented as opinion rather than fact, the Commonwealth established that Moynihan followed the "protocols and methods of verification adopted by the State trooper's unit" when analyzing the prints, and Moynihan was subject to cross-examination at trial. *Jean-Baptiste I*, 79 Mass. App. Ct. 1118, *2 (2011).  The admission of the fingerprints and related testimony was thus consistent with Massachusetts law, which requires that testimony regarding fingerprint matches be presented as opinion because of the subjective nature of fingerprint analysis. *Commonwealth v.*

19

*Gambora*, 457 Mass. 715, 729 n.22 (2010) (standard for admitting testimony regarding latent fingerprint matches).

To the extent that the petitioner is arguing that the continued admission of fingerprint evidence in Massachusetts courts under *Gambora* violates the Constitution, this claim fails because there is no clearly established Supreme Court precedent that so holds. *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (holding that habeas relief was not available where there were no Supreme Court holdings to support the petitioner's claim).

### D. **Claim Three: Joinder of Trials/Indictments**

Claim three asserts that:

> [b]y joining the trials, the petitioner's
> right to testify or to waive that right was
> sacrificed for judicial economy. The
> petitioner was also [prejudiced] by the
> joinder of the offenses because his co-
> defendant was allowed to testify regarding
> the circumstances that [led] up to the stop,
> namely that the petitioner had contacted him
> regarding selling weapons.

(Dkt. No. 1.) Like claim two, this claim is waived because the petitioner does not address it in his memorandum. *See Perkins*, 2007 WL 2507741, at *3. And, consequently, the petitioner's failure to address the claim also makes the Court's task of interpreting the petition more difficult. However, given the requirement that the petitioner exhaust state remedies before filing his habeas petition, the Court will couple a bit of logical reasoning with the benefit of the doubt and interpret

Claim Three as raising the same joinder arguments the petitioner raised before the Appeals Court.  There, the petitioner argued that the firearms possession charges, counts 12-14 in the indictment, should have been severed and tried separately.

The Supreme Court has held that improper joinder rises "to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *United States v. Lane*, 474 U.S. 438, 466 n.8 (1986).  This is the standard that the Appeals Court applied when it held that the petitioner had "not satisfied his burden of showing that the prejudice resulting from a joint trial on the indictments was so compelling that it prevented him from obtaining a fair trial." *Jean-Baptiste*, 79 Mass. App. Ct. 1118, at *3 (citing *Commonwealth v. Delaney*, 425 Mass. 587, 595 (1997)).  As the Appeals Court noted, even if the firearms possession charges had been tried separately, evidence that the petitioner was stopped two-days after the home invasion while in possession of the firearm used in that crime likely would have been admissible in the trial on the home invasion-related charges.  (*See* Parts III.E and III.F, *infra*, discussing the relevance of the firearm to the home invasion charges.)  Thus, the Court finds no error in the Appeals Court's decision that the petitioner was not prejudiced by the joinder of counts 12-14.

E. **Claim Four: Insufficient Proof Regarding the Assault and Battery Charges**

The petitioner's fourth claim is that there was insufficient evidence to convict him on the assault and battery charges.  He asserts that the trial judge incorrectly instructed the jury on the firearm element of armed robbery under M.G.L. c. 265§ 17.  Although the petitioner does not clarify the nature of the asserted defect in the instruction, the Court assumes that his argument is the same one raised below: that the jury should have been instructed that being armed with a working firearm was an element of the armed robbery charge.  (Dkt. No. 17 at 454). In his brief, the petitioner argues that the government did not establish this fact because the only evidence of his involvement in the crime was the testimony of Noel, who was given immunity in exchange for his testimony.  (Dkt. No. 30).

This claim is not cognizable here because it was not raised as part of the petitioner's direct appeal and the Appeals Court accordingly found it to be procedurally defaulted.  *Jean-Baptiste II*, 84 Mass. App. Ct. 1109, at *1.  As discussed above, this Court cannot review state court decisions that rest on adequate and independent state-law grounds, and a state court holding that a claim is procedurally defaulted is one such adequate and independent state-law ground.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *see also Lykus v. Commonwealth*, 432

Mass. 160, 163 (2000) (a defendant who fails to bring his claim to the attention of the reviewing court at the earliest possible time waives that claim).

In cases where the adequate-and-independent-ground rule applies, "federal habeas review of the claim[ ] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. The petitioner has not explained his failure to raise this claim on direct appeal and therefore has not established cause and prejudice. The petitioner also has not shown that he has suffered a miscarriage of justice, which "is a narrow exception to the cause-and-prejudice imperative, seldom to be used, and explicitly tied to a showing of actual innocence." *Burks*, 55 F.3d at 717. The petitioner has not argued that he is actually innocent and the fact that the evidence against the petitioner at trial was strong suggests that an actual innocence claim would be unlikely to succeed.

Further, as previously discussed, challenges to jury instructions that incorrectly explain state law generally do not provide a basis for habeas relief. (*See* Part III. B., *supra*). An instruction that relieves the government of the burden of proving an element of a crime is reviewable, *see id.* (citing

*Silva,* 52 F. Supp. 3d at 231), but that did not happen here.  As the Appeals Court explained, being armed with a working firearm is not an essential element of armed robbery.  *Jean-Baptiste II*, 84 Mass. App. Ct. 1109.  Instead, the jury needed to find that the crime involved a "dangerous weapon," and the trial judge's instructions were consistent with that requirement.  *Id.*

### F. <u>Claim Five: Double Jeopardy</u>

The petitioner argues that his conviction on the charges of assault and battery and assault by means of a dangerous weapon violates the bar on double jeopardy.  Like claim four, claim five was procedurally defaulted because it was not raised in the petitioner's direct appeal, *Jean-Baptiste II*, 84 Mass. App. Ct. 1109, and the petitioner has not shown cause and prejudice or actual innocence. (*See* Part III.E., supra).

The claim fails even if considered on the merits.  The double jeopardy clause guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  The clause extends to state prosecutions through the Fourteenth Amendment.  *Benton v. Maryland*, 395 U.S. 784, 794 (1969).  The double jeopardy clause "protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense." *Justices of BMC v. Lydon*, 466 U.S. 294, 306-

07 (1984).   The petitioner invokes the third of these principles

here.   In cases of alleged multiple punishment, the Supreme

Court applies the "same-element" test, which "inquires whether

each offense contains an element not contained in the other."

*United States v. Dixon*, 509 U.S. 688, 696 (1993).   If not, then

the two offenses are one and the petitioner cannot be punished

for both consistent with the double jeopardy bar.   *Id.*

Here, the petitioner's conviction on counts 8 and 9 for

assault with a dangerous weapon under M.G.L. c. 265 § 15B and

counts 10 and 11 for assault and battery under M.G.L. c. 265 §

13A satisfy the same-element test.   Each of the two offenses has

at least one required element of proof that is not common to

both.   Specifically, counts 8 and 9 require proof that a

dangerous weapon was used, while counts 10 and 11 do not.[3]

*Seitins v. Joseph*, 238 F. Supp. 2d 366, 380 (D. Mass. 2003).

Counts 10 and 11 require proof of a battery (the unjustified use

of force upon the person of the victim), while counts 8 and 9 do

not.   *Shea v. Porter*, 56 F. Supp. 3d 65, 81 (D. Mass. 2014).

The petitioner's conviction on these offenses did not violate

---

[3] The elements of assault and battery under M.G.L. c. 265 § 13A are: (1) the
intentional; (2) and unjustified; (3) use of force upon the person of
another.   *Seitins*, 238 F. Supp. 2d at 380.   The elements of assault by means
of a dangerous weapon under M.G.L. c. 265 § 15B are either: (1) an attempted
battery, which requires (a) intent; (b) an overt act; and (c) coming
reasonably close to accomplishing the battery; OR (2) a threatened battery,
which requires: (a) threatening conduct; (b) intent to place the victim in
fear of imminent battery; and (c) the victim perceiving the threat; AND,
under both theories; (3) the use of a dangerous weapon.   *Shea*, 56 F. Supp. 3d
at 81.

the bar on double jeopardy and the Court accordingly finds no error in the state court's consideration of this issue.

### G. Claim Six: Cumulative Effect of Errors

Finally, the petitioner urges the Court to find that the cumulative effect of the errors identified in claims one through five was to deprive him of a fair trial. *See United States v. Sanabria*, 645 F.3d 505, 516 (D. Mass. 2011) (explaining that the cumulative effect of multiple harmless errors may deprive a defendant of a fair trial where considered "against the background of the case as a whole," the errors prevented a fair trial).  The problem with this argument is that none of the decisions or rulings raised in claims one through five was reached in error, harmless or otherwise.  As discussed, the jury instructions, admission of opinion testimony regarding fingerprint analysis, and conviction for both assault and battery and assault with a deadly weapon all comported with state law and did not run afoul of the United States Constitution.  Further, like claims four and five, the petitioner's cumulative error claim is procedurally defaulted because it was not raised in the petitioner's direct appeal, and the petitioner has not shown cause and prejudice or actual innocence.  *Jean-Baptiste II*, 84 Mass. App. Ct. 1109.

**IV.  CONCLUSION**

For the foregoing reasons, it is respectfully recommended that the petitioner's habeas petition, (Dkt. No. 1), be DENIED. The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  February 10, 2017